## CIRCUIT COURT OF FAIRFAX COUNTY

William V. Gaymon,
executor of the estate of
William E. Gaymon,
deceased

v.

Violeta N. Gaymon et al.

October 14, 2003

Case Nos. (Chancery) 152472, 171423

BY JUDGE ARTHUR B. VIEREGG

In November 1997, William V. Gaymon, executor of the estate of his father, William E. Gaymon, filed a bill of complaint ostensibly seeking the guidance of this court in the administration of his father's estate, Chancery Case No. 152472 ("The Aid and Direction Suit"). Disappointed with certain trial court's decisions, Gaymon prosecuted an appeal in the Supreme Court of Virginia. The Court granted certain of the relief he sought but denied the rest.

Thereafter, Violeta Gaymon, the widow of William E. Gaymon, who had been named a defendant in the Aid and Direction Suit, filed a suit to surcharge and falsify the executor's accounts related to her husband's estate, Chancery Case No. 171423 ("The Surcharge Suit"). She alleged *inter alia* that the defendant executor had used estate assets to fund litigation to advance his own interests. The issues in the Aid and Direction Suit remanded to this court for decision and the Surcharge Suit were consolidated for trial. After that trial conducted on November 25, 26, and December 2, 2002, I took the consolidated litigation under advisement. I am prepared to rule. It is hoped that this letter opinion disposes of the contested issues. Given the prior history of this litigation, it is difficult to be hopeful.[1]

In this letter opinion, I will summarize material facts that gave rise to this litigation (Part I); I will outline the trial court proceedings in the Aid and Direction Suit and the appellate proceedings in the Supreme Court of Virginia (Part II); I will list the issues to be decided (Part III); and I will render the parties and counsel my decision (Part IV).

## I. *The Estate of William E. Gaymon*

William E. Gaymon's first wife was Estelle S. Gaymon. Their marriage produced two children, William V. Gaymon and Nicole Gaymon. Estelle S. Gaymon predeceased her husband. In 1988, William E. Gaymon married Violeta Gaymon. By a prenuptial agreement dated August 17, 1988, William E. Gaymon and Violeta Gaymon stipulated that each would retain their rights to separate property owned before the marriage.

In November 1995, William E. Gaymon underwent surgery for brain cancer. The cancer apparently spread. He underwent surgery for back cancer on June 13, 1996. On the day before this operation, June 12, 1996, he directed his broker, Merrill Lynch, to re-title his separately owned premarital asset, a Cash Management Account held by the Merrill Lynch brokerage firm ("Merrill Lynch Account"), in the joint names of Violeta Gaymon and himself with a common right of survivorship. Six months later, William E. Gaymon executed his last will of January 25, 1997. Almost six months later, on June 3, 1997, he died. In his January 25, 1977 will, he named his son, William V. Gaymon, his executor.

---

[1] Charles Dickens' nineteenth century novel, *Bleak House*, depicted an interminable lawsuit involving a decedent's estate. In that suit, *Jarndyce v. Jarndyce*, attorneys endlessly pleaded, argued, deposed, re-pleaded, and re-argued. Legal fees stripped bare the bones of the estate. The captioned litigation conjures up images reminiscent of Dickens' fictional lawsuit.

At his death, William E. Gaymon's principal assets included a home located on Fox Mill Drive in Fairfax, Virginia (the "Fox Mill Property"); two Philadelphia, Pennsylvania, rental properties ("the Cliveden Street Property" and the "Blakemore Street Property"); the Merrill Lynch Account; and tangible personalty including certain African art and artifacts. As a consequence of the *inter vivos* transfer of the Merrill Lynch Account to Violeta Gaymon and himself, that Account immediately passed to his wife upon his death and by operation of law and did not become part of his estate. It was the most valuable asset he owned at the time of his death.

In his last will, Mr. Gaymon devised a life estate in the Fox Mill Property to his wife with a remainder to his children. He devised the Blakemore and Cliveden Street Properties in Pennsylvania to his children. He made other dispositions of other property. The tangible personal property was devised to his children.

Following William E. Gaymon's death, friction developed between Violeta Gaymon and the decedent's children, particularly with respect to the payment of notes held by Chevy Chase Bank and SunTrust secured by deeds of trust encumbering the Fox Mill Property. Although she made the first SunTrust payment following her husband's death, due to interlineations in the will, Violeta Gaymon contended the decedent's children were obligated to pay all amounts owed pursuant to the Fox Mill notes. As this disagreement simmered in the months immediately following William E. Gaymon's death, the Fox Mill note payments were apparently not made and the possibility of foreclosure by the note holders surfaced. Tr. III, 55; Def. Ex. 88. At least, Violeta Gaymon's counsel, George Brandt, suggested this possibility. William V. Gaymon began making the note payments and continued to do so through November of 1997. He subsequently reimbursed himself for those payments with estate assets and caused the estate to make the next few payments. In or about March 1998, Violeta Gaymon began paying the Fox Mill note payments and eventually paid off the SunTrust note in its entirety.

During the Surcharge Suit trial, Violeta Gaymon testified without contradiction that she had paid off the SunTrust deed of trust, having made principal payments of approximately $14,000. She also testified she had made Chevy Chase Bank payments. She testified the Chevy Chase Bank note provided for a balloon payment of principal in 2011. Her testimony suggests that the payments on that note made by her therefore constituted payments of interest, taxes, and insurance. Tr. II, 14-15. Testimony in the Surcharge Suit was taken on November 25, 2002; November 26, 2002; and on December 3, 2002. References to the November 25, 2002, transcript are preceded by "Tr.";

references to the November 26, 2002, transcript by "Tr. II"; references to the December 3, 2002, transcript as "Tr. III."

After Violeta Gaymon began making the note payments, the Gaymon children began escrowing the principal portions owed pursuant to the notes and offered to make those payments if Violeta Gaymon would pay the Fox Mill note interest, taxes, and insurance. She never agreed to do so. Tr. III, 216-17.

Because the Cliveden Street Property was subject to a contract of sale, William V. Gaymon settled the sale of that property on account of which more than $59,000 was received by the estate. Tr. 140; Comp. Ex. 15. In September 1997, the executor paid $30,000 of those funds to his sister and himself as a partial advancement, since the Property had been devised to them. Comp. Ex. 3. In the first half of the following year, those advancements were repaid to the estate. *Id.*

## II. *The Litigation Between the Parties*

### A. *Overview*

On November 25, 1997, William V. Gaymon, as executor, filed a bill of complaint initiating the Aid and Direction Suit. He named as parties defendant, Violeta Gaymon and Nicole Gaymon, his sister. He did not name himself individually as a party; and although he named his sister as a party defendant, he never obtained effective service of his bill of complaint upon her.[2] In the Aid and Direction Suit, the executor sought the following relief: the invalidation of Violeta Gaymon's life estate in the Fox Mill Property; if unsuccessful in invalidating the life estate, a decree requiring Violeta Gaymon to pay Fox Mill Property interest, taxes, and insurance; the invalidation of the decedent's *inter vivos* transfer of the Merrill Lynch Account to Violeta Gaymon; as well as other miscellaneous relief. As executor, William V. Gaymon paid or incurred legal fees and costs on behalf of the estate of approximately $97,000 to litigate the Aid and Direction Suit and to appeal two adverse decisions to the Supreme Court of Virginia. The payment of more than $77,000 of those fees and expenses rendered the estate virtually insolvent.

---

[2] He testified he had always believed, in accordance with his attorneys' advice, that he personally would be bound by any decision of the trial court or the Supreme Court of Virginia with regard to decisions affecting his individual interests even though he had not named himself individually as a party to the lawsuit. Tr. III. As will be discussed later in this opinion letter, his counsel Mr. Sissman suggested otherwise in an earlier hearing in this court.

Had William V. Gaymon been successful in invalidating Violeta Gaymon's Fox Mill Property life estate, the remainder interests of the Gaymon children would have been promoted to fee simple interests with an immediate right to exercise dominion over the Property. The invalidation of William E. Gaymon's *inter vivos* transfer of a joint tenancy and survivorship interest in the Merrill Lynch Account to his wife would have resulted in that asset being transferred either under the will, *see, e.g.*, Tr. III, 50-51,[3] or otherwise to the Gaymon children as heirs by intestate succession because the will arguably contained no residuary clause devising anything but the decedent's pre-marital assets, except tangible personalty, to anyone. Tr. III, 70. As a consequence of the expenditure of estate assets to fund the Aid and Direction Suit and as a consequence of certain other transactions, Violeta Gaymon filed this Surcharge Suit challenging the executor's expenditure of estate assets to advance his personal interests.

## B. *The Aid and Direction Suit*

### 1. *The Executor's Bill of Complaint*

The following relief, *inter alia*, was sought by William V. Gaymon, executor, in the Aid and Direction Suit:

As to the Fox Mill Property:

1. That the Court enter a judgment declaring that the will's apparent devise of a life estate to Violeta Gaymon was precatory and ineffective to convey a life estate; or

2. If a valid life estate was conveyed:

a. That Violeta Gaymon be ordered to pay "expenses and payments" on the Fox Mill residence, including payment of the taxes, insurance, and interest on the notes secured by deeds of trust encumbering that Property; and

b. That she be ordered to reimburse the Estate of William E. Gaymon for payments made by the executor with estate assets except for principal payments on the Fox Mill notes.

As to the Merrill Lynch Account:

That William E. Gaymon's June 12, 1996, *inter vivos* transfer to Violeta Gaymon of the Merrill Lynch Account be declared invalid on the grounds of his father's incompetency and undue influence and constructive fraud visited upon his father by Violeta Gaymon.

---

[3] The Merrill Lynch Account was sometimes referred to by the executor in his pleadings in the Aid and Direction Suit as the "Templeton Growth Fund," as it had been referred to in the prenuptial agreement before those assets were later invested by the decedent in the Merrill Lynch Account.

As to a Central Fidelity Certificate of Deposit:

That Violeta Gaymon repay the estate the amount of that certificate of deposit, which she had redeemed.

As to the Testator's Powers:

That the executor be afforded the powers contained in Va. Code § 64.1-57 that were not afforded him in his father's will.

As to the Estate's Priority Expenses:

1. To deny Violeta Gaymon the maximum family expenses of $1,000 per month for twelve months as permitted by Va. Code § 64.1-151.1 and to afford her an appropriate lesser amount.

2. To declare that Violeta Gaymon had incurred excessive funeral expenses for her husband, including the expense for a reception, for which she had sought reimbursement from the estate.

As to the Philadelphia Properties:

That Violeta Gaymon be directed to pay the executor security deposits and rents collected by her.

As to tangible personalty:

That Violeta Gaymon be directed to permit the executor to inventory her deceased husband's tangible personalty located at the Fox Mill residence.

### 2. *This Court's Decision*

The parties tried the Aid and Direction Suit before me on June 23, 24, and 25, 1998. I announced my decision from the bench on the last day of trial. My original decision was to some degree modified after the executor filed a motion for reconsideration. However, most of the post-trial relief sought by the executor in that motion was denied. I ruled *inter alia* that the testator had intended to grant a valid life estate in the Fox Mill Property to Violeta Gaymon and that the terms of the will obligated the remainder persons, William V. Gaymon and Nicole Gaymon, to pay not only the principal portions of the Fox Mill notes, but also interest, taxes, and insurance due pursuant to those notes. I ruled that the executor had *not* sustained his burden to prove that the *inter vivos* transfer of the Merrill Lynch account should be set aside. I ruled the executor was obligated to pay Violeta Gaymon $2,000 of William E. Gaymon's funeral expenses as a priority expense and that $8,654 might be paid from the assets of the estate when other higher priority expenses had been satisfied and I ordered that an additional $2,569 in funeral expenses claimed by Violeta Gaymon were not payable at all. I granted the executor's motion for testamentary powers contained in Va. Code § 64.1-57 and I ordered Violeta Gaymon to afford the executor access to the Fox Mill Property

to inventory personalty situated there and to repay the amount of the Central Fidelity Certificate of Deposit. I ruled that Mrs. Gaymon was indebted to the estate for $1,200, with interest from June 3, 1997, for rents from the Philadelphia properties that she had collected and retained. I reserved jurisdiction to interpret or enforce the transfer and delivery of specific bequests of tangible personal property under the will to William V. Gaymon and Nicole Gaymon.

The executor filed an appeal with the Supreme Court of Virginia with regard to the determination of the validity of the Fox Mill Property life estate and, if unsuccessful in that regard, the remainder persons' duties to pay the principal and interest owed pursuant to the Fox Mill notes.

### 3. The Decision of the Supreme Court of Virginia

In its decision, Gaymon v. Gaymon, 258 Va. 225, 519 S.E.2d 142 (1999), the Supreme Court of Virginia affirmed this court's ruling that William E. Gaymon's will devised a life estate in the Fox Mill Property to Violeta Gaymon, but it reversed my ruling that the remainder persons were obligated to pay not only principal but also interest, taxes, and insurance owed pursuant to the Fox Mill deeds of trust. Emphasizing that the remainder persons had not been made parties defendant in the Aid and Direction Suit, the Court further declared:

> Turning to the liability of the remainder persons, we note that the Executor argues, citing Hill v. Huston's Ex'r, 56 Va. (15 Gratt.) 350 (1859), that the remainder persons cannot be charged with personal liability for the deeds of trust unless they accept the devise. However, our role in this case is to interpret the will, not to determine whether the remainder persons have accepted or disclaimed the devise. Additionally, the remainder persons are not parties to this action. Furthermore, the Executor limits his request to relief to reversing "that portion of the trial court's order putting a charge on the real estate and holding the remainder persons personally liable for interest on the mortgage and any other expenses." Under these circumstances we need not decide if the devise has been accepted by the remainder persons.
>
> Therefore, we will reverse that portion of the chancellor's order holding that Article 5 of the will imposed liability on the remainder persons for the interest due on the deeds of trust on the property and that "remainder interest" on the property "will be subject to a lien for

all amounts" paid by the life tenant, Violeta Gaymon, on the notes secured by the deed of trust.

Finally, we remand the case to the chancellor for allocation of liability for past payments in accordance with the principles set forth in this opinion.

258 Va. at 234 (emphasis added). Accordingly, because neither William V. Gaymon nor his sister were named as parties defendant to the Aid and Direction Suit, this court's jurisdiction vis-a-vis that suit is limited to determine the liability for past Fox Mill note payments made by the executor and the life tenant.

Upon remand, a hearing was held on April 18, 2001. On May 20, 2002, I entered a decree effectuating the Supreme Court's mandate and consolidating the remaining issues in the Aid and Direction Suit related to the disposition of the decedent's tangible personal property and the Surcharge Suit.[4] In that decree, I also declared that the Fox Mill payments made by the executor and reimbursed to himself from estate assets or such payments paid directly from estate assets, totaling $8,525.87 for the eight months prior to March 1998 should be repaid by the executor to the estate. Tr. of 4/18/01, 73. In the May 20, 2002, decree, I also ordered the consolidation of the Aid and Direction Suit and the Surcharge Suit.

## C. The Surcharge Suit

### 1. The Relief Sought

On March 14, 2001, Violeta Gaymon filed the Surcharge Suit against the William V. Gaymon, both as executor and individually, and against Nicole Gaymon individually.[5] Violeta Gaymon's bill of complaint was composed of four counts:

Count I: To Surcharge and Falsify the Executor's Accountings.
Count II: To Require a Full and Complete Accounting.
Count III: Removal of the Executor.
Count IV: The Settlement of Accounts by the Estate's Creditors.[6]

---

[4] The issue with respect to the tangible personal property was made moot by the parties' later agreed division and distribution of that personal property.

[5] Before entering an appearance in the Surcharge Suit on behalf of the executor, Mssrs. DiNucci and Perkins, representing Nicole Gaymon, successfully convinced this court that Long Arm Statute service of the complaint initiating that Suit on her was improper.

[6] Violeta Gaymon did not pursue this relief. It will not be further discussed herein.

## 2. *The Evidence*

In the Surcharge Suit, Violeta Gaymon principally contended William V. Gaymon, as executor, had improperly incurred and paid significant attorney's fees to advance his personal interests in the Aid and Direction Suit. She sought to surcharge the executor for those attorney's fees and costs improperly incurred and sought his removal as executor of her late husband's estate.

William V. Gaymon retained Susan Pollack as his attorney to advise him with respect to his father's estate. They signed at least two fee agreements. Neither made plain that Ms. Pollack was representing Mr. Gaymon only with respect to his role as executor and that she was not representing him in the advancement of his personal interests. Comp. Ex. 17 and 18. Mr. Gaymon, as executor, signed a third retainer agreement on November 29, 1998, with Ms. Pollack and Mr. Sissman to prosecute an appeal in the Supreme Court of Virginia challenging certain Aid and Direction Suit rulings adverse to him. Comp. Ex. 20. Mr. Gaymon personally guaranteed payment of those fees. Comp. Ex. 19. Ms. Pollack steadfastly contended on one hand that she only represented William V. Gaymon, as executor of his father's estate. Tr. III, 15. However, she also testified that she had always understood that the litigation filed and prosecuted by William V. Gaymon affected his personal interests as well and that he would personally be bound by the outcome of the litigation. Tr. III, 30, 32, 73. This testimony was inconsistent with an earlier representation made by Mr. Sissman to this court.[7] And it begs the question whom she believed was representing, William V. Gaymon's personal interests, since she believed him bound by the court's decisions.

William V. Gaymon filed an initial inventory with the Clerk of the Circuit Court of Fairfax County. Comp. Ex. 2. It disclosed the following estate assets: $12,331 of liquid personal assets and $21,215 of tangible personalty. It additionally reflected that the decedent owned real estate valued at $435,600, including the Fox Mill Property valued at $281,600. Mr. Gaymon subsequently filed five accountings with the Commissioner of Accounts.

The first accounting, which was filed after the Aid and Direction Suit trial, showed "income," increasing the value of the assets (after the subtraction of

---

[7] In the post-remand hearing of April 18, 2001, arguing with respect to the Virginia Supreme Court's emphasis that the remainder persons had not been named as party defendants, Mr. Sissman emphasized "Mr. Gaymon, as an individual, was *never* a party. So he's, you know, only a fiduciary." Transcript of hearing of April 18, 2001, at 55 (emphasis added). The implication was that the executor had never intended that he be personally bound by the Aid and Direction Suit outcome. Indeed, as Sissman testified in the Surcharge Suit, Pollack and he had filed the suit and prosecuted the appeal with respect to the life estate/remainder person dispute, because there was no one else who could. Tr. II, 105.

expenses of $90,111.74) to $59,474.95. Most of the increase was attributable to the receipt of proceeds from the sale of the Cliveden Street Property that the executor had originally paid to himself but later refunded to the estate upon advice of counsel. The balance of the "income" constituted insurance proceeds, insurance tax refunds, other refunds, and dividends. William V. Gaymon testified he had caused $30,000 to be paid to his sister and himself from the "income" received. The executor's first accounting disclosed the estate had paid out $70,697.75 in attorney's fees to Susan K. Pollack and the firm of Partridge and Perkins and had paid Fox Mill loan payments and related expenses of $6,531.66. Comp. Ex. 3.

The second accounting demonstrated the executor had paid total expenses of $10,481.73, of which $7,755.30 constituted additional legal fees and legal expenses paid to Susan K. Pollack and Partridge & Perkins, leaving liquid assets of $4,083.58. Comp. Ex. 4.

The third accounting reflected no additional payments had been made for attorney's fees, but that the estate had incurred $19,454.53 in attorney's fees since the filing of the second accounting. Tr. 115-16; Comp. Ex. 27. Those attorney's fees were not later paid due to the estate's lack of liquid assets.

The fourth accounting reflected that the Gaymon children had repaid the estate $2,138.46, the principal portion of Fox Mill note payments made by the estate on their behalf. Def. Ex. 153.

The fifth accounting reflected that the estate had paid the law firm of Harrison & Hughes $5,000 to investigate a lawsuit against Glenwood Roane, the lawyer who had drafted William E. Gaymon's will. Def. Ex. 153. The estate received a refund of $2,500 of these monies. The fifth accounting also reflected payments by the Gaymon children of interest on the principal portion of Fox Mill note payments made by the estate in the 1997-1998 time frame. *Id.*

Each of the five accountings were approved by the Commissioner of Accounts. *Id.*

At the Surcharge Suit trial, the principal witnesses were William V. Gaymon and his attorneys, Susan Pollack and Peter Sissman.

When asked if he had been prudent in incurring legal fees and expenses of more than $98,000, Mr. Gaymon contended his actions had been prudent and that he had simply followed his attorneys' advice. Tr. 199-200. He could not explain how his expenditure of fees to advance his interests as a remainder person or heir, as distinguished from those related to the administration of the estate, legitimately were charged to his father's estate rather than to himself apart from indicating that such payments were necessary to avoid a foreclosure sale of the Fox Mill Property. Although he had originally sought the advice

and direction of this court, he testified he had sought a reconsideration of this court's decisions and later appealed those decisions, because they were inconsistent with *his* view of his father's intentions.[8] Mr. Gaymon testified, moreover, that he had not explicitly approved what areas his attorneys pursued in connection with the litigation. He testified he had told his attorneys that he would rely on them to decide whether actions taken were appropriate for a fiduciary to take. Tr. 260-64. At no time, did he testify that he had obtained either an estimate of what the Aid and Direction Suit would cost or opinions of the estate's chances of success as to each of the issues it was pursuing.

Susan Pollack testified she assisted William V. Gaymon in qualifying as executor of his father's estate in the summer of 1997. Friction developed with Violeta Gaymon even prior to his qualification. A dispute and an exchange of letters ensued between Ms. Pollack on behalf of Mr. Gaymon and George Brandt, Esq., on behalf of Violeta Gaymon. Ms. Pollack asserted on behalf of Mr. Gaymon that the decedent's will required the life tenant to pay interest, taxes, and insurance. Also, Peter Sissman testified that he thought the intent of the testator was that the life tenant was supposed to pay the interest, taxes, and insurance. Tr. II, 80. Brandt contended that it directed the remainder persons to pay the Fox Mill notes. *See,* Def. Exs. 67-75. Ms. Pollack indicated in a September 1997 letter to Mr. Brandt that it would be necessary for Mr. Gaymon to file an aid and direction suit. Def. Ex. 75. She testified that she filed the Aid and Direction Suit because the Fox Mill notes were not being paid and because there was the possibility of a foreclosure. Tr. III, 36, 55. Peter Sissman testified that he had not been aware that Violeta Gaymon had begun making the note payments until the Supreme Court of Virginia had remanded the case with respect to this issue. Tr. II, 165. Ms. Pollack indicated that Brandt, Violeta Gaymon's counsel, had raised foreclosure as a possible problem in the late summer of 1997 if the parties did not resolve the note payment issue. Tr. III, 36; Def. Exs. 64, 70. Peter Sissman testified that he understood that foreclosure was possible due to the fact that the Fox Mill note payments were "at least sixty days past due." Tr. II, 80-81. Additionally, an April 1998 letter from one lender discussed potential foreclosure proceedings

---

[8] Mr. Gaymon was asked about his reasons for seeking a reconsideration of this court's decisions in the Aid and Direction Suit and his later appeal of that decree. He indicated he did not disagree with the decision but that his deceased father "disagreed" with it. It appears he simply felt that this court's rulings were erroneous in that they did not coincide with Mr. Gaymon's view of his father's intentions, a view that would have advanced Mr. Gaymon's personal interests. Tr. 202-10. Such a reason is not a basis for a fiduciary seeking the appellate review of a valid aid and direction suit, as will be discussed in this opinion. However, it would have been wholly appropriate for Mr. Gaymon *individually* to have sought such a reversal, since his interests were integrally involved.

when Violeta Gaymon failed to make a note payment on time. Def. Ex. 88. The evidence presented at trial showed that William V. Gaymon initially began making the Fox Mill note payments himself in August 1997 for the months of June through November of 1997, for which he later reimbursed himself, and then made such note payments out of estate assets through February 1998. Tr. 185-86; Def. Exs. 93, 153. Ms. Violeta Gaymon then began making the Fox Mill note payments and eventually paid off one of the two Fox Mill notes completely. *See,* Comp. Ex. 3, "Estate Expenses." At the time of the Surcharge Suit trial, Violeta Gaymon had not reimbursed the estate for the interest portion of note payments made by the estate prior to February 1998. Nor had the executor or the remainder persons reimbursed Violeta Gaymon for the principal portion of note payments she had made thereafter.

In or about November 1997, Peter Sissman was retained to assist Pollack in the litigation of the Aid and Direction Suit. Together, Pollack and Sissman made decisions related to the relief sought in amendments made to the initial bill of complaint. They did not "necessarily" confer with William V. Gaymon. Tr. III, 42. Shortly before trial, based on information obtained from Glenwood Roane, the attorney who had drafted William E. Gaymon's will, Sissman and Pollack amended the executor's pleadings to assert that William E. Gaymon had not intended to convey a life estate to his wife. Tr. III, 39-41. However, in the Surcharge Suit, William V. Gaymon testified he had not understood that his attorneys were attacking the validity of Violeta Gaymon's life estate in the Aid and Direction Suit. Tr. III, 215. When this court asked Mr. Sissman about his discussions with the executor about the costs of the Aid and Direction Suit and the prospects of success, Mr. Sissman's answers were confusing. He suggested that he had made an estimate of the attorney's fees involved and that the fees had turned out to be much higher than contemplated. He did not testify as to the amount of the fees estimated. Mr. Sissman seemed to suggest that legal expenses continued to mount because the returns the estate might realize in the case were substantial. Tr. II, 223-32. Mr. Sissman did not testify as to specific advice given with regard to the estate's prospects of success, nor did Mr. Gaymon. Ms. Pollack testified that she advised the executor that the estate had a "very high chance of prevailing" on the issue of the rights and obligations of the life tenants and the remainder persons, Tr. III, 183, but she was unable to provide more definitive testimony on the subject of probable success. *Id.* Ms. Pollack was similarly uncertain respecting her discussion of the chances of success with regard to challenging the transfer of the Merrill Lynch Account. Tr. III, 185.

In the Surcharge Suit, Sissman defended the failure of the executor and his sister to pay the Fox Mill Property interest, taxes, and insurance because

neither had overtly exercised an option to disclaim their remainders. He further testified, moreover, that he had therefore counseled William V. Gaymon, as executor, to file the appeal of the adverse rulings in the Aid and Direction Suit with respect to whether or not the remainder persons were obligated to pay Fox Mill notes, interest, taxes, and insurance because, having not affirmed their remainder interests, the remainder persons were not in a position to appeal this court's decision. Tr. II, 105. Sissman testified Pollack and he had discussed this disclaimer issue and had concluded that the deadline was one year after the Supreme Court of Virginia had handed down its decision in the Aid and Direction Suit. Tr. II, 166-67. He did not explain how this deadline had been arrived at. Sissman also testified that he had advised the executor that such an explicit acceptance would obligate the Gaymon children to make payments of principal. Tr. II, 164. On the other hand, Sissman also testified that William V. Gaymon and his sister had indicated they would not disclaim those remainder interests devised to them. Tr. II, 185-86. Consistent with this testimony, Mr. Gaymon testified he and his sister had escrowed the principal amount of the Fox Mill note payments and had offered to make those payments to Violeta Gaymon when the Fox Mill note problem materialized.

Mr. Sissman further testified that the appeal to the Supreme Court of Virginia had been initiated, because this court had not construed William E. Gaymon's will consistently with the decedent's testamentary intent. Tr. II, 104-05. He reasoned that, because William V. Gaymon and Nicole Gaymon had not elected to accept their remainder interests, if the executor did not appeal this court's construction of the will, no one else could. Sissman also testified that, if the executor did not appeal, the estate would ultimately be responsible for paying the Fox Mill notes and the executor would not be reimbursed for payments made by the executor. Tr. II, 105-08. Sissman testified that, if Violeta Gaymon had not been granted a valid life estate, she would have had no obligation to pay any portion of the Fox Mill Property notes, but conversely, if her life estate were valid, she would have the obligation to pay interest, taxes, and insurance. Tr. II, 106. He concluded that the executor had a duty to seek a declaration of the validity of the life estate and to appeal this court's finding that Mrs. Gaymon enjoyed a life estate because it was "important to get it established correctly." Tr. II, 105-06.

Sissman also testified that the legal fees, though substantial, were reasonable, because the estate's assets would be greatly increased in value if the *inter vivos* transfer of the Merrill Lynch Account were set aside. Tr. II, 114-18; Def. Ex. 157. He conceded that the Merrill Lynch Account issue was the most important issue in the case (Tr. II, 226) and had been the most

difficult and time-consuming to prepare for trial, especially since the executor's case sought to set aside a transfer that had been made before the testator's will and a year before the testator's death. Tr. 115-18; Ex. 157.

At trial, a focal issue was the testator's mental capacity when he made that *inter vivos* transfer. But no attention was directed to the competency of the testator when the will was executed approximately six months later. Tr. II, 155-58. Sissman testified that he had not focused on the fact that the testator had lacked capacity when he made the *inter vivos* transfer but impliedly had regained it by the time he signed the will almost six months later. Tr. II-159. If he regained competence, he might have rescinded the transfer. Of course, William E. Gaymon's failure to have regained capacity in the six months following the transfer would have called into question the efficacy of the will, under which William V. Gaymon had qualified, acted, and gained his authority to bring the Aid and Direction Suit.

## III. *The Issues*

### A. *Aid and Direction Suit*

In *Gaymon v. Gaymon*, 258 Va. 225, 519 S.E.2d 142 (1999), the Supreme Court of Virginia emphasized that the Fox Mill Property remainder persons were not parties to the Aid and Direction Suit. Accordingly, although judgments might have been entered against Violeta Gaymon, as life tenant, for payments of interest, taxes, and insurance, judgments could not have been entered against the Gaymon children for payments of principal. The Supreme Court held on appeal that the remainder persons were not liable for the interest, taxes, and insurance pursuant to the terms of the Fox Mill notes. *Id.* at 234. The Court remanded the case to this court with directions to evaluate the liability between the estate and the decedent's devisees of the Fox Mill Property interests for past note payments made by the estate.[9] That issue was

---

[9] The Court found that the testator's interlineations in the will did not reverse the common law principle that a life tenant bears the obligation of preserving the property, which would include a responsibility to pay the interest on a note, but that the remainder persons have a duty to pay the principal. *Id.* Yet, the Court did point out that the interlineations of William E. Gaymon, constituting a contrary testamentary direction, negated the common law principle that the estate had the duty to pay the debts of the testator. *Id.* I determined that the estate was not liable on the mortgage payments on the Fox Mill Property because this property passed to the life tenant and remainder persons under the will. Therefore, I found that William V. Gaymon, as the executor, could not properly use estate funds to pay the Fox Mill notes payments, nor reimburse himself for such payments he individually made. I concluded Mr. Gaymon should refund such payments he had reimbursed himself and those estate payments made on his behalf. While the executor might be required to make such

decided in the Aid and Direction Suit before the Surcharge Suit trial. This court held that Mr. Gaymon had improperly reimbursed himself both for Fox Mill note payments made and for estate funds advanced to make such note payments.

## B. *The Surcharge Suit*

The Surcharge Suit involves the following issues: (1) whether or not the Suit is barred by the defenses of estoppel, *res judicata,* and waiver; (2) whether Violeta Gaymon bears the burden of proving the executor's violation of his fiduciary duties or whether the executor bears the burden of proving the propriety of his conduct; (3) whether Mr. Gaymon's conduct as executor was proper; (4) if not proper, to what extent, if any, he should be surcharged; (5) if not proper, whether he should be removed as executor of his father's estate; (6) if not proper, whether his entire accounting should be re-opened; and (7) whether or not the Gaymon children's Fox Mill remainder interests should be subject to a lien to pay the remaining Fox Mill balloon note. I will address each of these issues in the order they are set forth above.

## IV. *Decision*

### A. *Estoppel, Res Judicata, and Waiver*

William V. Gaymon contends that Violeta Gaymon is precluded from prosecuting this Surcharge Action, because in the Aid and Direction Suit, she did not object to his standing to prosecute the claims that involved his personal interests. He relies on the legal defenses of estoppel, *res judicata,* and waiver. In support of these arguments, however, the executor cites but two cases, neither Virginia decisions, *McDonald v. Cole,* 46 W. Va. 186, 32 S.E. 1033 (1901), and *Hodges v. Kimball,* 91 F. 845 (1899). These decisions stand for the proposition that if an executor's *standing* to bring a suit (for instance, for failure to qualify as executor) is not contested in that suit, that lack of standing may not be subsequently raised by a party who was a party defendant in that suit.

However, the arguments made are not supported by the cases he cites. Nor do Mr. Gaymon's arguments pass scrutiny.

The defense of *res judicata* requires the entry of a final judgment in litigation involving the same parties. It bars the relitigation of all causes of action or defenses actually litigated or which might have been litigated.

---

payments arising out of his conduct as executor, the enforcement of rights between the remainder persons and the life tenant fell outside the ambit of this litigation.

Sinclair & Middleditch, *Virginia Civil Procedure,* 14.11(A), 633, *citing Cromwell v. Sac,* 94 U.S. 351, 24 L. Ed. 195 (1897). But here, the roles of the parties are reversed. In the Aid and Direction Suit, the executor is the moving party seeking relief. In the Surcharge Suit, Violeta Gaymon is the moving party. Accordingly, neither common claims nor common defenses are implicated; nor are common prayers for relief asserted.

The Virginia Supreme Court has "consistently held that a litigant who seeks to bar a claim based upon the defense of *res judicata* must establish four elements: identity of the remedy sought; identity of the cause of action; identity of the parties; and identity of the quality of the persons for or against whom the claim is made." *Davis v. Marshall Homes,* 265 Va. 159, 164, 576 S.E.2d 504 (2003), *citing State Water Control Bd. v. Smithfield Foods, Inc.,* 261 Va. 209, 214, 542 S.E.2d 766, 769 (2001); *Balbir Brar Assocs. v. Consolidated Trading & Servs. Corp.,* 252 Va. 341, 346, 477 S.E.2d 743, 746 (1996); *Wright v. Castles,* 232 Va. 218, 222, 349 S.E.2d 125, 128 (1986).

Furthermore, in the Aid and Direction Suit, Violeta Gaymon could not properly have challenged the executor's *standing* to initiate the Aid and Direction Suit, nor does the executor explain how she could do so. Nor in the Surcharge Suit does Violeta Gaymon challenge the executor's standing to have filed the Aid and Direction Suit, rather, she has merely challenged the executor's violation of fiduciary duties in expending estate funds to pursue his own interests in that Suit.

The executor's reliance on the defense of waiver is similarly flawed. Waiver is the intentional relinquishment of a known right and applies to any right conferred by law or contract. *Roenke v. Virginia Farm Bureau Ins. Co.,* 209 Va. 128, 134-35, 161 S.E.2d 704 (1968). The waiver of such a right will not be implied except upon clear and unmistakable proof of such an intention to waive such rights. *Id.* The executor presented no proof of such an intention or facts from which such intention might be inferred.

B. *Burdens of Proof*

William V. Gaymon has argued at great length that, because the Commissioner of Accounts approved his accountings, Violeta Gaymon bore the burden to prove the impropriety of his conduct as executor of his father's estate. The logic of his argument is inconsistent with Virginia statutory law. Irrespective of whether or not a commissioner of accounts has or has not approved an executor's accountings, a complainant in a surcharge and falsification suit generally bears the burden of proof in any event. *Commercial & Savings Bank v. Burton,* 183 Va. 133, 139, 31 S.E.2d 289 (1944). *Ex parte* approval of accounts by a commissioner of accounts does not alter that

burden, unless the challenger has participated in those proceedings before the commissioner, a circumstance not present here. Va. Code § 26-34.

However, the general principle, just recognized, that a complainant in a surcharge and falsification suit bears the burden of proving that the fiduciary has acted improperly, is subject to an exception. Where a fiduciary's conduct materially advances his own personal interests, the law places the burden on the fiduciary to demonstrate that his conduct was appropriate. *Scott v. Porter*, 99 Va. 553, 556, 39 S.E. 220 (1901). Such a fiduciary thus bears the burden to demonstrate that his actions were taken within the scope of his authority, were taken in good faith, and comported with ordinary prudence. 183 Va. at 149. William V. Gaymon cites no contrary authority.

The principal focus of this surcharge and falsification suit is William V. Gaymon's expenditure of funds to litigate the Aid and Direction Suit, the expenditure of funds of such a magnitude that the estate was rendered virtually insolvent. Although Violeta Gaymon does not challenge all the relief sought by William V. Gaymon in that suit, she maintains the primary relief sought was improper: the executor's attempt to have Violeta Gaymon's life estate deemed precatory and unenforceable and his alternative prayer that Violeta Gaymon be *ordered* to pay the Fox Mill note interest, taxes, and insurance, and his attempt to invalidate Violeta Gaymon's interests in the Merrill Lynch Account.

At oral argument, Violeta Gaymon conceded that the Gaymon children were entitled to the Cliveden proceeds, in other words that the devise of the Cliveden Property was not adeemed by the decedent's contract to sell the Property before his death and its settlement after his death. The parties seemed to concur that, while such a devise by Virginia law would be extinguished by ademption, *see Bauserman v. Digiulian*, 224 Va. 414, 417, 297 S.E.2d 671 (1982), *citing Collup v. Smith*, 89 Va. 258, 15 S.E. 584 (1892), pursuant to Pennsylvania law, such proceeds were subject to an equitable conversion and would be payable by the executor to the devisees. In effect, the parties agreed that Pennsylvania law governs this ademption issue and justifies the Gaymon children's entitlement to the Cliveden Property sale proceeds. Since the Gaymon children later repaid the estate those proceeds received, this issue appears pertinent only to whether the executor was bound to reimburse the estate on the interest of the Cliveden sale proceeds received between the withdraw and repayment of those proceeds to the estate.

There is little dispute that these matters gave rise to most of the attorney's fees expended.

The effect of nullifying William E. Gaymon's grant of a life estate to his widow, if successful, plainly would have promoted the Gaymon children's

remainder interests to fee simple interests. The effect of requiring Violeta Gaymon to pay the Fox Mill note interest, taxes, and insurance exculpated himself and his sister from having to meet those obligations. The effect of invalidating William E. Gaymon's transfer of the Merrill Lynch Account to his wife with a right of survivorship would have eventuated in that account passing to the executor and his sister either as legatees or as heirs. Since the executor would directly and materially have been benefited by the relief he sought in the Aid and Direction Suit and the payments he made to himself, in the trial of the Surcharge Suit, he bore the burden of proving that expending estate funds to achieve these ends was proper. *Porter, supra.*

## C. *Propriety of the Executor's Conduct*

There are three tests for evaluating the propriety of a fiduciary's conduct. *Commercial & Savings Bank v. Burton*, 183 Va. at 149. The first is whether or not the fiduciary's conduct fell within the scope of his powers and duties. The second is whether or not the fiduciary's conduct was undertaken in good faith. The third is whether or not the conduct is consistent with ordinary prudence. *Id.*

### 1. *The Executor's Conduct in Bringing the Aid and Direction Suit*

The first inquiry as to the propriety of William V. Gaymon's actions in initiating the Aid and Direction Suit is whether he enjoyed the authority both to initiate the Suit and to seek the relief challenged by Violeta Gaymon. *Id.* Since he was advancing a supposed claim of the estate, I conclude that Mr. Gaymon had the authority to file the Suit. While it is less plain that the exercise of that authority was consonant with Mr. Gaymon's *duties* as executor,[10] I conclude that this issue elides with, and is more appropriately addressed with the second and third tests enumerated above: whether Mr. Gaymon initiated the Aid and Direction Suit in good faith[11] and whether it was prudent for him to have done so. A discussion follows as to whether or not Mr. Gaymon's financing of the Aid and Direction Suit with estate funds satisfy these tests.

---

[10] Mr. Gaymon asserts that the Eighth clause of his father's will afforded him the authority to "manage" the decedent's real property and by implication that he therefore was empowered to seek relief with respect to the real property in the estate related to the Fox Mill Property. Management does not equate with litigation. Nor does the executor cite authority that it does. His argument in this regard accordingly is found to be unpersuasive.

[11] With regard to the prayer for relief related to the Fox Mill notes and the Merrill Lynch account.

### a. *Good Faith*

A pivotal issue with regard to whether or not William Gaymon's filing of the Aid and Direction Suit was undertaken in good faith is whether or not he was, as executor, faced with valid executorial quandaries requiring the guidance of a court or whether, as Violeta Gaymon contends, he principally filed the Suit to promote his personal interests and those of his sister.

Aid and direction suits are permitted to seek advice and direction where necessary. As Judge Lamb reportedly stated in his treatise:

[A] fiduciary is not required to act at his peril; he need not eat the doubtful vegetable in order to ascertain if it is a wholesome mushroom or a poisonous toadstool. . . .

In such cases of doubt or difficulty, the expense incident to instituting and conducting such a suit, including an allowance by the court of proper compensation to the fiduciary's counsel, is to be borne by the estate, not by the personal representative out of his own pocket or out of his compensation or commissions.

Harrison, *Wills and Administration*, § 560, at 231. And the construction of a will may be an appropriate subject of such a suit. *Id.*

On the other hand, in plain cases, an administrator:

is not justified in seeking, aid, direction, guidance, and protection from the court. The estate should not be subjected to this unnecessary expense, which is generally quite substantial, because such aid of a court can only be obtained in a plenary suit in equity with all persons interested in the point of doubt regularly convened as parties.

Harrison, *Wills and Administration*, § 560, at 230. Furthermore, where the decedent's intentions are at issue, the executor has the duty to defend the testator's intent *expressed in the testator's will, Butt v. Murden*, 154 Va. 10, 152 S.E. 330 (1930), but no authority supports the novel proposition that he may challenge the testator's intentions expressed in the will. Moreover, if the contest merely involves a question of who will take from a decedent's estate, an executor or administrator should leave the interested parties to litigate that issue. *Id.* An executor should not seek the aid and direction as to matters where significant expense is involved and such expense is more properly borne by the parties in interest. *Butt, supra.* Accordingly, actions taken by a

fiduciary to promote his own interests, as distinguished from those necessary to assist him in the performance of his duties, are not chargeable to the estate. *Clare v. Grasty*, 213 Va. 165, 170, 191 S.E.2d 184 (1972). The parties are also referred to an excellent opinion in *In re Estate of Wicker*, 58 Va. Cir. 331 (Henrico 2002) (Hammond, J.), to the same effect. Finally, once an aid and direction suit has been litigated, a fiduciary may not appeal the decree affording the guidance received to sort out further the obligations of beneficiaries. *Shocket v. Silberman*, 209 Va. 490, 492-93, 165 S.E.2d 414 (1969). Nor is it appropriate for a personal representative to appeal a decree where the chancellor's ruling does not adversely affect the interests of the estate. *Caine v. Freier*, 264 Va. 251, 257, 564 S.E.2d 122 (2002).

In *Caine*, the Bank of America was the personal representative of the testator's estate. The Bank filed an aid and direction suit seeking assistance in the distribution of the assets of the estate, naming the decedent's daughter, son, and widow as defendants. The trial court issued a decree, and both the Bank and the children filed an appeal. The Supreme Court of Virginia dismissed the Bank as an inappropriate party to the appeal. 264 Va. at 257. The Court found that neither the Bank's interest in the administration of the estate, nor the estate itself, were adversely affected by the chancellor's ruling, and therefore it was improper for the Bank to file an appeal. The Court rejected the notion that the Bank possessed an "institutional" interest in the administration of the estate and found that the only parties possibly aggrieved by the trial court's decree were the children. *Id*. Here, William V. Gaymon, as executor, filed the Aid and Direction Suit seeking this court's guidance in administration of William E. Gaymon's estate. This court's final decree in the Aid and Direction Suit afforded the executor such direction. Therefore, Mr. Gaymon, as the executor, was not aggrieved by the ruling providing the very guidance that was sought, and his expenditure of estate funds to appeal this court's decree was improper. For reasons developed *infra*, his appeal of decisions related to the Fox Mill Property and the Merrill Lynch Account, his improper appeal of the direction sought and received, constituted conduct not calculated to assist him in performing his executorial duties, but rather the advance his personal interests.

The principles enunciated by the Supreme Court of Virginia in *Shocket* and *Caine* with regard to the prosecution of appeals by a personal representative of a decedent are precisely the more general principles expressed by the Court in *Butt*. Therefore, just as a personal representative may not properly expend estate funds to prosecute an appeal in the interests of the beneficiaries and not the estate itself, similarly an executor may not initiate

and prosecute litigation to advance the interests of beneficiaries when the interests of the estate are not advanced.

In the Aid and Direction Suit, William V. Gaymon, as executor asked this court to invalidate Violeta Gaymon's life estate; if unsuccessful, to order Violeta Gaymon to pay the principal portion of the Fox Mill notes; and to invalidate the decedent's transfer of a survivorship interest in the Merrill Lynch Account to his wife. As earlier discussed, the effort to defeat Violeta Gaymon's life estate would have elevated the Gaymon children's remainders in the Fox Mill Property to fee simple interests. The alternative relief sought with regard to the Fox Mill Property would have ordered Violeta Gaymon to pay the interest, taxes, and insurance owed in connection with the Fox Mill notes. However, because the Gaymon children were not parties to the Suit, an order could not have been entered requiring *them* to pay interest, taxes, and insurance. The judicial rescission of the decedent's *inter vivos* transfer of a joint tenancy in the Merrill Lynch Account with right of survivorship to Violeta Gaymon would have eventuated in the most valuable asset owned by the decedent passing either under the will or, more likely, by intestate succession to the Gaymon children. None of this relief sought by the executor implicated Mr. Gaymon's performance of his executorial duties. Each was plainly taken to aggrandize the executor and his sister.

The executor did advance explanations to rationalize his conduct. With respect to his attempt to invalidate Violeta Gaymon's life estate, he contended he was defending his view of his father's testamentary intent. What is evident, however, is that he sought to frustrate the decedent's intent to convey a life estate to Violeta Gaymon, an intent explicitly stated in the decedent's will. Moreover, since no other reason was advanced for challenging the life estate, it is apparent that Mr. Gaymon had no valid executorial purpose in attacking Violeta Gaymon's life estate and that his use of estate funds to prosecute the Aid and Direction Suit to benefit himself constituted bad faith. This conclusion is further confirmed by the conduct of the executor's attorney, Susan Pollack, who had consistently recognized the validity of Violeta Gaymon's life estate in correspondence to both Mrs. Gaymon's counsel and to the Commissioner of Accounts until shortly before trial. The recognized validity of the life estate was also demonstrated by the acts of the Gaymon children themselves, who had escrowed funds to repay Mrs. Gaymon for her payment of the principal portion of Fox Mill note payments. Tr. 184-93.

At the Surcharge trial, Mr. Sissman attempted to justify the challenge of Violeta Gaymon's life estate. He testified that, if the executor did not file the suit, no one else could have done so since William V. Gaymon and his sister had not affirmed or disclaimed their remainder interests. But given the will's

plain expression that a life estate was intended, Sissman's testimony supposed – without authority to support it – that a fiduciary is charged with the duty of using estate funds to litigate will challenges when no other party otherwise seeks to do so. Moreover, Mr. Sissman's emphasis on the Gaymon children's failure to disclaim is otherwise wholly unpersuasive. The deadline for the Gaymon children's disclaimer had passed in early 1998,[12] well before the executor's attack on the life estate was first pleaded. Mr. Sissman's attempt to rationalize the executor's suit otherwise fails to recognize the obvious. Mr. Gaymon and his sister might have affirmed their remainder interests had they wished to challenge the life estate. It was their individual choice, at their expense, to do so or not. They did not, instead William V. Gaymon, in bad faith, opted to use the funds subject to his trust to do so.

The executor's alternative prayer that Violeta Gaymon be ordered to pay interest, taxes, and insurance owed pursuant to the Fox Mill notes, similarly was not taken on account of an exigency in administering the estate. Nor was it filed to obtain a declaratory judgment as to the resolution of a dispute between two contending sets of beneficiaries, the life tenant and the remainder persons. It was filed to gain a decree *mandating* that one of those contending beneficiaries, Violeta Gaymon, be required to pay the Fox Mill notes interest, taxes, and insurance, while no relief sought was requested against the executor individually or pursued against his sister. The coercive relief sought belies the suggestion that the executor was simply clarifying the respective duties of the life tenant and the remainder persons, a theme sometimes advanced as a justification for Mr. Gaymon's use of estate assets to fund this aspect of the Suit. Furthermore, no evidence was advanced that proved that the Fox Mill Property was a necessary source of funds to pay the decedent's debts, although this was also advanced by the executor and his counsel as a plausible reason for filing the Suit. In the absence of such debts, had the life tenant and the remainder persons not paid the notes, they rather than the estate would have suffered any loss eventuating from a putative foreclosure.

While the executor made no plausible argument why, as a fiduciary, he was bound to challenge Violeta Gaymon's life estate in the Fox Mill Property,

---

[12] Virginia Code § 64.1-189 afforded William V. Gaymon and his sister nine months following their father's death to renounce their remainder interests. Since William E. Gaymon died in June 1997 and the complaint initiating the Aid and Direction Suit was not filed until late November 1997, the executor and his sister had less than four months to renounce their remainders when William V. Gaymon's complaint initiating that Aid and Direction Suit was filed. Accordingly, even if the possibility of renunciation justified the initial filing of the Aid and Direction Suit in this regard, the executor plainly could not prudently have continued to prosecute it with respect to the Fox Mill Property issues thereafter.

he did advance reasons for alternatively seeking a decree requiring Violeta Gaymon to pay the Fox Mill Property interest, taxes, and insurance. He points to the fact that Violeta Gaymon and the executor failed to make those payments after William E. Gaymon's death in the late summer and fall of 1997, consequently raising the possibility of the lenders' foreclosure on the Fox Mill notes. He contends, therefore, that the executor had a fiduciary duty to ensure that this dispute was legally sorted out in a court of law to avert the foreclosure sale of the Fox Mill Property.

The executor's good faith and prudence in seeking this relief, however, is belied by his failure to demonstrate that the estate itself would have been prejudiced by such a foreclosure in the event Ms. Gaymon and the Gaymon children did not resolve their dispute. First, the executor's evidence with regard to a supposed foreclosure was unpersuasive. While a letter was introduced indicating the possibility of a foreclosure after Violeta Gaymon began paying the entirety of the Fox Mill note payments, the evidence shows that no action was taken on account of her continued note payments. The executor similarly failed to prove that the interests of the estate required that the Suit be filed. The executor's attorneys argued that the equity in the Fox Mill Property might be necessary to pay the decedent's debts. However, no evidence of such indebtedness was proven. Accordingly, if a foreclosure eventuated, the life tenant and the remainder persons, not the estate, would have suffered any loss resulting from a foreclosure. The executor's bad faith in filing and prosecuting the Aid and Direction Suit is further indicated by the specific relief sought by him. The executor failed to name himself as a party and failed to perfect service on his sister, while effectuating service on Violeta Gaymon and praying only that she be ordered to make disputed portions of Note payments. Had the Supreme Court of Virginia affirmed this court's order, the remainder persons, whom the executor apparently represented had not decided whether or not to disclaim their remainders, could not similarly have been ordered to make the entirety of the Fox Mill note payments.

I conclude in accordance with the cases and authorities cited with regard to the duties of a fiduciary that William V. Gaymon has failed to demonstrate that his prosecution of the life tenant/remainder person dispute with estate funds either accorded with the good faith or prudence required of a fiduciary. This was a dispute between feuding beneficiaries that should have been litigated by the parties in interest with their own funds.

Finally, the executor attempted to set aside the *inter vivos* transfer of the Merrill Lynch Account on the grounds that William E. Gaymon lacked capacity to make the transfer, Violeta Gaymon's alleged undue influence over him, and her alleged constructive fraud. This extraordinary relief was not

sought on account of any necessity to administer the decedent's estate. The principal reason advanced was that, if successful, the executor would establish the estate's right to the Merrill Lynch Account thereby increasing its value, a result synonymous in these circumstances with increasing the assets that likely would be distributed to William V. Gaymon and his sister. Plainly this was a suit to be brought, if by anyone, by those that stood to gain by setting aside the transfer, the Gaymon children. *Butt v. Murden, supra.* The executor advanced no persuasive authority that estate funds may be spent to file a lawsuit merely because such a suit, if successful, would augment the assets to be distributed by the estate.

The executor argues, however, that his attempt to set aside the Merrill Lynch transfer was justified because the executor was enforcing a right held by the estate. In support of this argument, the executor relies on two decisions of the Supreme Court of Virginia, *O'Brien v. O'Brien*, 259 Va. 552, 526 S.E.2d 1 (2000), and *Colley v. Cox*, 209 Va. 811, 167 S.E.2d 317 (1969). Each is distinguishable from the facts here.

In *O'Brien*, the executor, after naming all interested parties (unlike the executor here), sought to collect a beneficiary's note payable to the decedent. The defendant beneficiary contended his obligation represented by the note should be set-off against his bequest. Virginia law recognizes such a right of set-off if intended by the testator in his will. However, the testatrix did not indicate such an intention in her will. The defendant argued that the executor should not have expended estate funds to oppose the set-off because the executor stood to gain by not permitting the set-off. No such desire was expressed. The Supreme Court of Virginia held that, under such circumstances, the executor's expenditure of funds to oppose the set-off was appropriate, despite the fact that the executor would have benefited by disallowance of the set-off.

In *Colley*, the executor sought to recover the estate's interest in a joint account owned by the testatrix and her son. Since the account was not held by the cotenants with a right of survivorship, the executor prevailed in establishing the estate's ownership of an interest in the account, despite the fact that the executor would have benefited by defeating the cotenant's claim that the account was owned by right of survivorship and, therefore, passed to him. In the *Colley* case, the issue of the executor's entitlement to fees from the estate does not appear to have been at issue and is inapposite for that reason alone. Therefore, the executor's reliance on this case appears misplaced.

In finding that William V. Gaymon violated his fiduciary duty of good faith, I do not find that Virginia law prohibits an executor from suing on behalf of the estate simply because the executor's interests might be advanced.

Rather, as discussed *supra*, where an executor will personally benefit from actions taken in his capacity as executor, he bears the burden of demonstrating that his conduct was consonant with his fiduciary duty. *See Porter, supra*. In both the *O'Brien* and *Colley* cases, as distinguished from the executor's actions at issue here, the executor was enforcing the estate's rights, the validity of which were not contested. Here, however, the estate held no rights in the real estate devised to the life tenant and remainder persons, and the executor's attempt to invalidate Violeta Gaymon's life estate and the transfer of the Merrill Lynch Account were, at best, a contested putative right.[13] The circumstances in *O'Brien* and *Colley*, therefore, are plainly distinguishable from the executor's suit initiated here. Plainly, moreover, the enforcement of these putative claims had marginal chances of success given the testator's expressed intentions to devise a life estate to his wife and his earlier intention to transfer the Merrill Lynch Account to her and given the fact that the will (under which the executor was acting) post-dated the challenged *inter vivos* transfer.

While the executor's alternate prayer that Violeta Gaymon be ordered to pay the Fox Mill notes interest, taxes, and insurance plainly involved dramatically better chances of success than the executor's attempt to set aside the life estate and the Merrill Lynch Account transfer, even this relief sought by him is distinguishable from the *O'Brien* and *Colley* fact patterns. As to the interest, taxes, and insurance issue, William V. Gaymon was not seeking to enforce any right held by the estate but rather was seeking to require the life tenant to take action that would benefit the remainder persons, of which he was one.

### b. *Prudent Use of Estate Funds*

Finally, Mr. Gaymon, as executor, presented little concrete evidence to justify his prudence in filing and prosecution of the Aid and Direction Suit as it pertained to the Fox Mill Property and Merrill Lynch Account. Mr. Gaymon generally testified, as did his attorneys, that he often discussed the case with them. But he afforded almost no explicit testimony as to the actual advice received, especially with respect to his decision to pursue the prayer for relief at issue. Although Mr. Sissman testified that he believed that he had provided

---

[13] The rights of the estate are actual in *O'Brien* and *Colley*, whereas, in this case, there is merely an attempt to establish the supposed rights of the estate by Mr. Gaymon. *See, Stamie E. Lyttle Co. v. County of Hanover*, 231 Va. 21, 26, n. 4, 341 S.E.2d 174 (1986) ("A 'claim' is defined as, *inter alia*, 'an authoritative or challenging request,' 'a demand of right or a supposed right'. . .").

the executor an estimate of the expense of the Suit and that the expense had turned out to be much greater than expected, he could not quantify the estimated fees communicated to Mr. Gaymon nor did he differentiate the respective estimated fees that would be incurred to set aside the Fox Mill life estate; to determine the duty of the life tenant to pay Fox Mill Note interest, taxes, and insurance; and to set aside the Merrill Lynch Account transfer. Mr. Gaymon's testimony evinced no understanding of the chances of succeeding with respect to each aspect of relief sought in the Aid and Direction Suit. While Ms. Pollack testified regarding vague recollections of discussions with Mr. Gaymon respecting the chances of success in the Suit (Tr. II 183, 185), no other testimony demonstrated Mr. Gaymon's understanding of those estimates. Nor was evidence presented that the executor or his attorneys weighed the chances of success to set aside the life estate or the Merrill Lynch transfer against the expenditure of estate funds. Plainly an ordinarily prudent person would have engaged in such a calculus.

### c. The Executor's Advice of Counsel Defense

Mr. Gaymon contended that, even if he was not afforded a statutory exemption from being surcharged legal fees if based on advice of counsel, Virginia common law afforded him that immunity. William V. Gaymon asserts that he is shielded from surcharge pursuant to Va. Code Ann. § 64.1-57(1)(k) because he relied on the advice of his legal counsel. Mr. Gaymon's reliance is misplaced, as the statute grants powers to an executor where a will refers to § 64.1-57, thereby incorporating the powers listed therein. However, William E. Gaymon's will did not reference § 64.1-57, and those powers were not granted William V. Gaymon until entry of the decree in the Aid and Direction Suit. Therefore any "safe harbor" provision afforded by § 64.1-57(1)(k) is inapplicable under the circumstances here. The executor refers this court to Mills' Administrator v. Talley's Administrator, 83 Va. 361, 5 S.E. 368 (1887), wherein a fiduciary was absolved of liability caused by his counsel's failure to sue within the statute of limitations. Such a result is unremarkable. A lay person such as Mr. Gaymon must rely on his attorneys for legal advice. However, the fact that an attorney is retained and affords advice may not supplant a fiduciary's exercise of due care. In this case, Mr. Gaymon had the burden of demonstrating that he had exercised prudence in bringing the Aid and Direction Suit, since, for reasons discussed above, his personal interests were so inextricably enmeshed with the ends sought in that litigation. Despite that burden, apart from generally indicating that he discussed various aspects of the case with his attorneys, he presented no

evidence demonstrating that he had balanced the chances of success against the fees that probably would be incurred. Such a balancing was not the duty of his counsel, it was his own fiduciary duty in managing assets that were not his own.[14]

### 2. *Breach of Fiduciary Duty*

In *In re Wicker*, an executrix had filed suit to advance her own interests as a beneficiary of an estate before she was removed. Despite her removal, she petitioned to recover attorney's fees expended by her as executrix. Judge Hammond, after reviewing many Virginia cases, held that where the object of an executor's suit is to enrich the executor as a beneficiary, the estate could not properly be charged for her attorney's fees. 58 Va. Cir. 331, *supra.*

Similarly here, I conclude that the estate of William E. Gaymon may not be charged the attorney's fees and costs paid or incurred by William V. Gaymon in connection with the principal transactions that were the subject of the Aid and Direction Suit: the prayer to set aside Violeta Gaymon's life estate, alternatively, to mandate her to pay Fox Mill note interest, taxes, and insurance, and to invalidate the transfer of an interest in the Merrill Lynch Account to Violeta Gaymon. In reaching this conclusion, I find that William V. Gaymon pursued his self-interest in prosecuting these three prayers for relief; that he has failed to demonstrate that he paid or incurred these fees to do so in good faith; and that he has failed to demonstrate that, as a fiduciary, he acted with the prudence of an ordinary man in seeking to set aside the life estate devised to Violeta Gaymon and the transfer to her of the Merrill Lynch Accounts. He will accordingly be surcharged for the fees paid in this regard.

### 3. *The Executor's Payments to Himself (Other Than Attorney's Fees) Or on His Own Behalf*

William V. Gaymon paid Fox Mill note payments in the fall of 1997 and then reimbursed himself for those payments. He later caused the estate to make the note payments until Violeta Gaymon began making these payments in March 1998. Prior to the Surcharge Suit trial, this court held that Mr. Gaymon could not appropriately reimburse himself for Fox Mill payments made by the estate or cause the estate to make further Fox Mill note payments. Mr. Gaymon argues that even, if this ruling is correct, he is subordinated to the

---

[14] On brief, the executor devotes almost eight pages to this issue and cites to testimony as to advice he had received from his counsel upon which he relied in pursuing the Fox Mill Property and Merrill Lynch issues. Executor's Brief, 67-74. A review of that testimony reflects virtually no concrete testimony as to the substance of that advice.

position of William E. Gaymon's creditors, who, in turn, enjoy a priority over other administrative expenses, including funeral expenses. Va. Code Ann. § 64.1-159. This argument, however, fails to address whether or not Mr. Gaymon's payment of those creditor's debts was proper in these circumstances. As I found, they are not. Accordingly, he will be surcharged for all amounts reimbursed to himself or paid by the estate that he has not otherwise repaid the estate. The amount advanced in this regard appears to amount to $10,700.62, less repayments of principal portions of $2,138.46 with note interest paid of $859.37. *See* Def. Ex. 153 (1st, 4th, and 5th Accountings). The executor shall be required to repay the estate the amounts of the Fox Mill Note principal and interest improperly reimbursed or otherwise paid by the estate, with interest. Since the parties did not introduce a calculation of that amount, I shall direct counsel to perform that calculation to be included in the decree embodying this letter opinion. Once the estate has been made whole, the life tenant and the remainder persons may then separately litigate their remaining obligations to one another. Similarly, Mr. Gaymon's subordinate claims may be formally advanced and considered.

Finally, Violeta Gaymon additionally challenges another payment made to reimburse the executor for $1,593.42 in expenses he incurred. At least $1,529.21 were associated with the litigation in the Aid and Direction Suit related to the principal prayers for relief related to the Fox Mill Property and the Merrill Lynch Account; $1,529.21 will be surcharged to the executor. To the extent Violeta Gaymon seeks to surcharge the executor for other reimbursements or payments made (apart from attorney's fees), I conclude the executor has sustained his burden of proving that such payments constituted properly approved administrative expenses and that they have not been shown to be chargeable to Mr. Gaymon.

The first payment in the amount of $674.79 related to the Cliveden Property. Violeta Gaymon has not demonstrated that this expense was improper. The second in the amount of $3,549.34 related to proper first accounting administrative costs. Although a small portion pertained to the Aid and Direction Suit, I do not find on balance that that small portion should be surcharged. It has been taken into account in the part of the opinion that follows.

D. *Surcharge of Attorney's Fees*

The executor paid at least $77,719.74 to his attorneys related to the administration of his father's estate and the litigation of the Aid and Direction Suit. Additional fees exceeding $19,000 were incurred but not paid.

Neither party presented expert testimony as to the reasonableness of the fees paid and incurred; nor did either party identify the specific services performed for the estate for which fees were paid or incurred. I have reviewed the attorney's fees statements of the executor's attorneys, principally the bills of Ms. Pollack and Mr. Sissman, but find it impossible in the main to distinguish the legal services performed in connection with the administration of the estate (including the fees properly incurred for specific relief in the Aid and Direction Suit necessary for the administration of the estate) from those fees for services incurred to litigate the Fox Mill Property and Merrill Lynch Account issues in that Suit to advance the executor's personal interests.

In addition, the executor advanced $5,000 to explore a suit by the estate against Mr. Roane, the attorney who drafted William E. Gaymon's will. Concluding that the will was negligently prepared, he retained the law firm of Harrison & Hughes to investigate the filing of such a lawsuit. Plainly, however, the only interests that would have been advanced in such a suit were those of William V. Gaymon and his sister. Under such circumstances, the unreimbursed portion of those fees, $2,500, will also be charged with interest to the executor.

Since the executor had the burden of proving the propriety of his actions that advanced his personal interests, I conclude he also had the burden of proving what fees were properly and reasonably incurred for the administration of the estate as distinguished from those that were not properly incurred by Mr. Gaymon in the performance of his executorial duties. Furthermore, as a fiduciary, Mr. Gaymon had the prudential duty to require that his attorney's bills make plain for what services the fees shown on those bills were incurred. But, at trial, he afforded no explanation of the fees. Generally, when a party has the duty of proving entitlement to an award of attorney's fees, that party has the burden of proving the reasonableness of those fees. *Seyfarth, Shaw, Fairweather & Geraldson v. Lake Fairfax Sever, Ltd. Partnership*, 253 Va. 93, 480 S.E.2d 471 (1997). Part and parcel of that duty is requiring bills that are sufficiently comprehensible that the charges may be understood. And fulfilling that burden also generally requires an expert witness to testify to the reasonableness of the bills. *Mullins v. Richlands Nat'l Bank*, 241 Va. 447, 403 S.E.2d 334 (1991).

I inductively conclude that these principles similarly place the burden on the executor to demonstrate which of his bills paid were rendered for services benefiting the estate. Because the fee statements of the executor's attorneys do not identify what fees were properly incurred by Mr. Gaymon in connection with the administration of the estate, including fees properly incurred in connection with the Aid and Direction Suit, this court might surcharge all fees

not so identified as having been improperly incurred. However, I will not do so because during the June 26, 2003, hearing before me, counsel for both sides conceded in oral argument that this court might exercise its discretion in light of my involvement with the case to make an award of legal fees to be surcharged.

I have carefully reviewed the attorney's fees statements of Mr. Gaymon's attorneys, Compl. Exs. 23-25, and I have also considered the proceedings before me. After doing so, I find that at least $63,029.21 in fees and expenses were incurred and paid to advance the personal interests of William V. Gaymon and are chargeable to him.

As discussed *infra*, William V. Gaymon made out a relatively better case for filing the Fox Mill Note interest, taxes, and insurance claim for relief in that (i) he did so armed with an opinion that he would likely succeed, and (ii) he advanced a rationale for taking this action, i.e., loss of the Fox Mill Property as a source of funds to pay estate debts. Although I found that the executor failed to demonstrate that this relief was sought in good faith, because of the possibility that this portion of my decision might on appeal be questioned, I conclude that it is necessary to make a finding as to the reasonable fees incurred in seeking the Fox Mill note interest, taxes, and insurance relief. Noting both that this issue was essentially a legal one and further that the record makes plain that legal services were disproportionately incurred to set aside the Merrill Lynch Account transfer, I find that the reasonable cost of litigating the Fox Mill Note interest, taxes, and insurance approximated $8,000.

E. *Removal of the Executor*

A court of equity may remove an executor where a breach of his fiduciary duty is demonstrated. It is a matter within the discretion of the court. *Willson v. Kable*, 177 Va. 668, 15 S.E.2d 56 (1941). Contrary to the executor's argument, removal does not require clear and convincing proof, although a fiduciary appointed by a testator will less readily be removed than one not so appointed. *Id*. at 668. Unlike the *Willson* situation, in which the trust involved suffered no loss but merely dissatisfaction by another fiduciary, William V. Gaymon's sweeping misuse of estate assets to fund attorney's fees to advance his own interests justifies his removal as executor. His attorneys advance a pragmatic argument in his behalf. They contend that, even if he has violated fiduciary duties to the detriment of the estate and even if he should be surcharged fees paid to his attorneys to advance his personal interests, he nevertheless is well-acquainted with his father's estate and should not be

removed. They argue that the appointment of a new fiduciary will involve unnecessary expense. It is at least inferable from his repeated testimony that he merely followed the questionable advice of Susan Pollack and Peter Sissman and that he should not be penalized for receipt of such legal advice afforded him and upon which he relied to his detriment. There is much in this record to suggest that the executor's attorney's failed to identify what was proper for Mr. Gaymon to do as executor from what was improper for him to do to advance his personal interests. I do not suggest, however, that Mr. Gaymon may be absolved by such ill-advised advice. Plainly, he must have or should have understood that he was using estate assets to pursue his individual interests.

This argument, however, fails to address an inherent problem in it, a conflict of interest in the event William V. Gaymon sees fit to appeal this decision or should he otherwise fail to repay the estate the fees surcharged. Although Mr. Gaymon appears generally to be a decent, responsible person, I also conclude that, in this dispute, he unfortunately has not differentiated his duties as a fiduciary from his personal interests. Therefore, I conclude Mr. Gaymon should be replaced as executor of his father's estate. The prayer to disqualify him as executor of his father's estate is granted.

Mr. Gaymon shall forthwith turn over all books and records of the estate to his successor. The administrator appointed *cum testamento annexo* shall marshal the estate assets and shall take all other actions necessary to complete the administration of the estate of William E. Gaymon and enforce both this court's surcharge order and the previous orders entered in the Aid and Direction Suit.

I will ask both sides, within twenty-one days of the date of this letter opinion, to nominate an experienced attorney with estate administration experience who might act as Mr. Gaymon's successor and who would be agreeable to both sides. If the parties are unable to agree on such a person, I will appoint a successor subject to his agreement to serve.

## F. *A Complete Accounting*

Violeta Gaymon maintains that the entirety of the executor's accountings should be subject to an accounting. In support of this relief, she refers this court to *Lister v. Virginia National Bank*, 209 Va. 739, 167 S.E.2d 346 (1969), for the proposition that, when asked to do so, a court of equity may order that the entire account be re-opened. *Lister* makes plain that there is a distinction between re-opening a fiduciary's entire accounting and merely reviewing specific matters sought to be surcharged and falsified. Violeta

Gaymon has demonstrated that the Fox Mill note reimbursements and payments and attorneys' fees paid and charged in connection with the Aid and Direction Suit should be surcharged and falsified. These are discrete matters that have been fully litigated. In addition, however, Violeta Gaymon has demonstrated that William V. Gaymon also may wrongly have taken advantage of tax refunds to which she was entitled. This matter, in my judgment, is not a basis for re-opening the entire account but rather a claim that Violeta Gaymon may pursue against the estate. After taking into account the evidence presented, I conclude that Violeta Gaymon has not made out a case for the re-opening of the accountings that have been approved by the commissioner of accounts.

### G. *Violeta Gaymon's Prayer for Additional Fox Mill Security*

In her brief, Violeta Gaymon prays for other relief. She contends, based on *Morrison v. Morrison*, 174 Va. 58, 4 S.E.2d 776 (1974), that she is entitled to a decree requiring the executor's Fox Mill Property remainder interest to be encumbered by the amount of the remaining unpaid Fox Mill balloon note. William V. Gaymon contends that the *Morrison* decision does not support that relief, especially under the present circumstances. I concur. Furthermore, this relief is not sought in Violeta Gaymon's bill of complaint; this prayer for relief is denied.

### Conclusion

For the reasons set forth above, William V. Gaymon is surcharged the amounts set forth in this opinion,[15] which amounts shall be repaid to his father's estate within sixty days of the entry of a decree embodying this decision; he is replaced as executor; and he shall forthwith take steps to provide his successor with all books and records related to the estate and to otherwise cooperate with his successor fiduciary. In addition, Violeta Gaymon

---

[15] The total amount of the surcharge shall be calculated by counsel and included in the decree. It shall include legal interest on the Fox Mill reimbursements and payments from the date of the accountings in which those payments first appear unless otherwise shown. It shall include legal interest on the attorney's fees paid by the estate and on the Cliveden payments (until repaid to the estate) on the same basis.

may schedule a one-hour hearing to pursue an award of attorney's fees in the next forty-five days.